IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARCUS I., by and through his Parent and next best friend, KAREN I., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>STATE OF HAWAII, DEPARTMENT OF EDUCATION, )<br><br>Defendant. )<br>_____ ) | Civ. No. 08-00491 DAE/BMK |

MARCUS I., by and through his    )    Civ. No. 08-00491 DAE/BMK
Parent and next best friend, KAREN )
I.,                              )
                                 )
            Plaintiffs,          )
                                 )
    vs.                          )
                                 )
STATE OF HAWAII,                 )
DEPARTMENT OF EDUCATION,         )
                                 )
            Defendant.           )
_____  )

## ORDER AFFIRMING DECISION OF HEARINGS OFFICER

On October 20, 2009, the Court heard Plaintiffs' appeal of a decision rendered by an administrative hearings officer concerning the appropriateness of a student's individualized education program.  Matthew C. Bassett, Esq., appeared at the hearing on behalf of Plaintiffs, Deputy Attorney General Joanna B.K.F. Yeh appeared at the hearing on behalf of Defendant Department of Education ("DOE").  After reviewing the appeal, and the supporting and opposing briefs, the Court AFFIRMS the Hearings Officer's Findings of Fact, Conclusions of Law and Decision.

## BACKGROUND

Marcus I. is a 15-year-old boy[1] with autism who is eligible to receive special education and related services under the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. §1415, and Chapter 56, Hawaii Administrative Rules ("HAR").

Marcus has resided on Oahu since 2001, when he came from Maui to undergo mental health treatment at Kahi Mohala, a mental health treatment center with residential facilities, and schooling at Loveland Academy ("Loveland"), a private day-treatment facility for developmentally disabled children.[2]  Although Marcus was initially expected to stay at Kahi Mohala for only six months, he was not discharged until August 2005.  After his discharge, Marcus remained on Oahu and entered into a therapeutic residential program provided by Child and Family Services, called Mana House.

---

[1]  Marcus will turn 16 on December 31, 2009.

[2]  Marcus's mother and two younger siblings continued to live on Maui. Marcus's mother has been a Houston-based flight attendant for Continental Airlines for over twenty years.  Marcus's father unexpectedly passed away in October 2007.

Marcus has attended Loveland since his original placement there in 2001.[3]  Loveland is a for-profit limited liability corporation, and its sole owner and managing member is Dr. Patricia Dukes.  Loveland is nationally accredited under the Counsel for Association of Rehabilitation Facilities ("CARF") to provide community based mental health treatment.  Loveland is not a residential educational facility, nor has a residential education component.  Instead, during non-school hours, Marcus resides with a paraprofessional aide or other Loveland employee in an apartment next to Loveland grounds.

Marcus's "home school,"[4] the school that a student would normally attend if he or she were not placed elsewhere under the IDEA, was Iao Intermediate School for the 2006-2007 school year, and Baldwin High School ("Baldwin") for the 2007-2008 school year.  Both schools are located on Maui.  Marcus has not attended either school, receiving specialized services at Loveland instead.

---

[3] It is unclear to the Court, and apparently to the parties in this case, which specific state agency placed Marcus at Loveland.  However, it is clear that Marcus was placed at Loveland by the State, and not unilaterally by his parents.

[4] The home school, through an administrator and teacher, is a required participant in the IEP formation process.

Marcus was last placed at Loveland pursuant to a settlement agreement reached under his 2006-2007 Individualized Education Plan ("IEP"). Marcus now remains at Loveland under the "stay put" provision of the IDEA.

In May 2007, a team of teachers and administrators convened as required under the IDEA to discuss Marcus's IEP for the upcoming 2007-2008 school year.  The meeting was held on Maui and was attended by: Catherine Kilborn, the Iao Intermediate School Principal; Lavina Volner, a special education teacher; Catherine Taylor, an autism behavior specialist; Chanda Chadda, an occupational therapist; Mary Auvil, the Baldwin vice-principal; Kim Cambra, a regular education teacher; and Denise Guerin, a District Education Specialist.  Not present at this meeting were any teachers, administrators, or paraprofessionals from Loveland Academy, nor either of Marcus's parents.[5]

The primary result of the May IEP meeting was to change the least restrictive environment for Marcus from a day-treatment center, like Loveland, to a residential educational facility.[6]  The IEP team considered DOE employee

---

[5]  The record shows that both Loveland and Marcus's parents were notified and aware of the May IEP meeting.  However Marcus's parents declined to attend for unspecified reasons, and Loveland's policy is not to attend IEP meetings when the parents are not present.

[6]  A residential education facility completely integrates a student's education
(continued...)

observations of Marcus at Loveland over the past school year that showed an

apparent stagnation and/or regression of Marcus's educational and physical

progress, as well as the lack of sufficient data and input from Loveland

administrators and teachers regarding Marcus's progress.  These factors led the IEP

team to the conclusion that Marcus needed a more restrictive environment than

what Loveland provided in order for him to progress.  Specifically, the IEP team

felt that Loveland could not adequately prepare Marcus to meet his long term goal

of returning to live with his family after the age of twenty-one.

After considering a continuum of placement options as mandated by

the IDEA, the IEP team decided that Marcus required placement in a residential

educational facility, but did not include a placement in a specific facility at that

time.[7]  There are no residential educational facilities in the State of Hawaii.  This

---

[6](...continued)
and residential programs, and provides full-time supervision and support for the
student.  A residential education facility is considered a more restrictive
environment than a day-program like Loveland, and much more restrictive than
placement in a public school.

[7]  The IEP team also appears to have based this placement on a request from
Marcus's father.  At some point prior to the May IEP meeting, Marcus's father, out
of apparent concerns for Marcus's safety at Mana House, approached two team
members and requested that Marcus be moved into a residential education facility.
The father then provided the team members with a brochure for a facility in Santa
Barbara, California.  According to testimony provided by the team members, this

(continued...)

placement was incorporated into an IEP document ("May IEP") and included in a Prior Written Notice ("PWN") of the action, as also mandated by the IDEA, which was then transmitted to Marcus's parents on May 11, 2007.

A month later, in June 2007, another meeting was held to prepare for Marcus's transfer from Loveland to a residential school that Fall. Marcus's parents were invited to the meeting but, again, did not attend. Present at this meeting were three members from the May IEP team: Catherine Kilborn, Mary Auvil, and Denise Guerin. Additionally, administrators of a residential school in Texas, Five Oaks Achievement Center ("Five Oaks"), participated by phone. No other parties were present. After this meeting, a letter and draft transition plan was sent to Marcus's parents, which specified that Five Oaks was the anticipated residential placement.

On August 29, 2007, Marcus's IEP team held a second meeting to finalize his May IEP. The August IEP team consisted of the following members: Amy Strand, a general education teacher; David Riggs, a special education teacher; Lisa Gifford, a District Education Specialist; Randall Bryant, Executive Director

---

[7](...continued)
request played a part in the team's decision to change Marcus's placement. The California facility, however, ceased operations before placement could be finalized.

for Five Oaks; Denise Guerin and Mary Auvil.  At this meeting, Marcus's father,

Mark I., was present, as well as Julie Dzigas, a care coordinator from Loveland,

Matthew Bassett, Marcus's attorney, and Ryan Ota, a Deputy Attorney General.

The IEP produced as a result of the August meeting (the "August

IEP") was substantially identical to the May IEP, except that Five Oaks was

specifically incorporated into the IEP as Marcus's residential school placement for

the 2007-2008 school year.  The August IEP also provided that Marcus's parents

would be given an opportunity to visit Five Oaks at DOE's expense.

The parents eventually visited Five Oaks in late September, during

which they received a formal tour of and met with its administrators.  At some

point after this visit, the parents informed DOE that they did not find Five Oaks

acceptable for Marcus's placement.

Shortly thereafter, in early October 2007, Marcus's father suffered a

heart attack and died.  Also at that time, Mana House closed and Marcus was left

without a residence, leaving him a ward of the state.[8]  Without an appropriate

living environment, Marcus faced the prospect of having to return to Maui.

---

[8]  Although this portion of Marcus's residential history is complex, the Court
recognizes that Marcus at no point became a foster child, nor was placed in a foster
home.

Dr. Dukes agreed to provide temporary supervision for Marcus until a new residence could be found.  However, when it became clear that there were no appropriate residences for Marcus on Oahu, Dr. Dukes created a new residential program for him called Marcus House.[9]  Marcus House combined a residential living arrangement with paraprofessional supervision.  Currently, Marcus House is located in a two-bedroom apartment in a building adjoining his current academic program at Loveland, on Piikoi Street in Honolulu.  Dr. Dukes and other Loveland teachers and staff manage the Marcus House program, including arranging Marcus's paraprofessional support.

On October 24, 2007, Marcus's mother, on behalf of Marcus, filed a Request for Impartial Due Process Hearing with DOE, claiming that the May and August IEPs (collectively, the "IEPs") did not provide the least restrictive environment, as required under the IDEA.  The hearing was assigned to Hearings Officer Haunani H. Alm in the Department of Commerce and Consumer Affairs ("Hearings Officer Alm").  Hearings were held on Maui in the months of April, May and July, 2008.

---

[9]  The parties dispute whether Marcus House is a "therapeutic living program."  Marcus House is not licensed by any state agency, but does provide residential and support services for Marcus.  Accordingly, the Court will refer to Marcus House simply as a "residential program."

On October 3, 2008, Hearings Officer Alm issued a Findings of Fact, Conclusion of Law and Decision on the sole issue of whether the IEPs offered Marcus a placement in the least restrictive environment.  Relying on evidence indicating that Marcus was regressing while at Loveland, Hearings Officer Alm found that Marcus required a more restrictive environment than was being provided at Loveland.  As such, Hearings Officer Alm concluded that Plaintiffs had failed to prove by a preponderance of the evidence that the IEPs did not provide Marcus with the least restrictive environment.

On October 30, 2008, Plaintiffs appealed the Decision by filing their complaint in this case pursuant to 20 U.S.C. § 1415(i)(2)(A).  Plaintiffs' opening brief was filed on April 29, 2009.  (Doc. # 26.)  DOE filed its opposition brief on May 29, 2009.  (Doc. # 27.)  On June 15, 2009, Plaintiffs replied.  (Doc. # 28.)

On July 17, 2009, this Court held a hearing on the administrative record.  (Doc. # 30.)  During oral argument on the appeal, the Court was informed that DOE had subsequently developed IEPs for Marcus that determined his home public school of Baldwin on Maui would be a sufficient educational placement. The Court expressed concern with the stark difference in placement between a fully residential facility in Five Oaks and the public school setting at Baldwin. Accordingly, the Court deemed the initial answering and reply briefs withdrawn

9

and ordered the parties to appear before the Magistrate Judge to set a new briefing

schedule.  In these new briefs, the parties were ordered to address the subsequent

placement at Baldwin and any impact, if any, it had on the instant appeal.

Pursuant to the Court's order, the parties met with Magistrate Judge

Kurren and set a new briefing schedule.  (Doc. # 32.)  DOE filed its new answering

brief on September 14, 2009.  (Doc. # 36.)  Plaintiffs then filed their reply brief on

September 28, 2009.  (Doc. # 37.)

<u>STANDARD OF REVIEW</u>

The IDEA states in part:

> [a]ny party aggrieved by the findings and decision made
> [pursuant to an administrative hearing], shall have the
> right to bring a civil action with respect to the complaint
> presented pursuant to this section, which action may be
> brought in any state court of competent jurisdiction or in
> a district court of the United States, without regard to the
> amount in controversy.

20 U.S.C. § 1415(i)(2)(A).

When a party files an action challenging an administrative decision

under the IDEA, a district court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii)

basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); <u>see also</u> <u>Ojai</u>

Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993).  The party

challenging the administrative decision bears the burden of proof.  See Seattle Sch.

Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996); Hood v. Encinatas Union

Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007).

"[J]udicial review in IDEA cases differs substantially from judicial

review of other agency actions, in which courts generally are confined to the

administrative record and are held to a highly deferential standard of review." Ojai

Unified Sch. Dist., 4 F.3d at 1471.  District courts have discretion concerning how

much deference to give to state educational agencies.  Gregory K. v. Longview

Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987).  Courts need not follow the

traditional test that findings are binding if supported by substantial evidence or

even a preponderance of the evidence.  Id.  A court may not, however, simply

ignore the administrative findings.  Ojai Unified Sch. Dist., 4 F.3d at 1474.  Given

the expertise of the administrative agency and the political decision to vest the

initial determination with the agency, deference to the hearing officer is warranted

in cases where the officer's findings are "careful and thorough." Id. (citing

Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)); Capistrano v. Unified

Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  In the end, district

courts are free to determine how much deference to accord decisions of a hearing

11

officer in light of the circumstances.  <u>County of San Diego v. Cal. Spec. Educ.</u>

<u>Hearing Office</u>, 93 F.3d 1458, 1466 (9th Cir. 1996).

<u>DISCUSSION</u>

Plaintiffs raise three "issues on appeal:" (1) whether Hearings Officer

Alm erred in finding that Loveland could not provide a free and appropriate public

education ("FAPE") for Marcus; (2) whether Hearings Officer Alm erred when she

concluded that Five Oaks was the least restrictive environment; and (3) whether

Hearings Officer Alm erred in failing to apply principles of res judicata and

collateral estoppel from earlier decisions on Marcus's educational placement.

(Opening Brief at 1.)

As DOE notes, however, the only issue that was fully exhausted

before Hearings Officer Alm was whether the IEPs offered Marcus a placement in

the least restrictive environment.  "[W]hen a plaintiff has alleged injuries that

could be redressed to any degree by the IDEA's administrative procedures and

remedies, exhaustion of those remedies is required."  <u>Robb v. Bethel Sch. Dist. #</u>

<u>403</u>, 308 F.3d 1047, 1048 (9th Cir. 2002); <u>see also</u> 20 U.S.C. § 1415(i)(2)(A); <u>J.L.</u>

<u>v. Mercer Island School Dist.</u>, 575 F.3d 1025, 1038 (9th Cir. 2009).  Here,

Plaintiffs did not raise before Hearings Officer Alm the issue of whether DOE

provided a FAPE.  Instead, the Due Process Complaint and Plaintiffs' closing brief

12

all contemplate the only issue before Hearings Officer Alm was whether DOE

provided Marcus with the least restrictive alternative.  (Administrative Record on

Appeal ("AR") at 4; 48-49.)

Accordingly, this Court's jurisdiction is limited to reviewing the fully

exhausted claim regarding the least restrictive environment.  See J.L., 575 F.3d at

1038 (holding district court lacked subject matter jurisdiction over unexhausted

claim).  The Court cannot and will not make any determinations as to whether the

IEPs provided Marcus with a FAPE.  The Court will, however, consider the third

"issue on appeal," regarding the principles of res judicata and collateral estoppel,

because that argument relates directly to whether Five Oaks constitutes a

placement in the least restrictive environment.

I.    Least Restrictive Environment

The IDEA requires that "to the maximum extent appropriate" students

with disabilities

> are educated with children who are not disabled, and
> special classes, separate schooling, or other removal of
> children with disabilities from the regular educational
> environment occurs only when the nature or severity of
> the disability of a child is such that education in regular
> classes with the use of supplementary aids and services
> cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

13

Known as "mainstreaming" or the "least restrictive environment," this provision is designed to indicate a strong preference within the IDEA for educating handicapped with nonhandicapped children as much as possible.  See Bd. of Educ. of Hendrick Hudson Central School. Dist. v. Rowley, 458 U.S. 176, 181 n.4 (1982); id. at 202 ("The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible.").  However, "the IDEA's preference for mainstreaming is not an absolute commandment." Poolaw v. Bishop, 67 F.3d 830, 836 (9th Cir. 1995).  While efforts should be made to place a student in the least restrictive environment, the least restrictive environment must also conform to the student's IEP.  County of San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458, 1468 (9th Cir. 1996).

The Ninth Circuit has adopted a four-factor balancing test to determine whether a district's placement offers education in the least restrictive environment: (1) the educational benefits of placement full-time in a regular class; (2) the nonacademic benefits of such placement; (3) the effect the student has on the teacher and other students in the regular class; and (4) the cost of mainstreaming the student.  Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland, 14 F.3d 1398, 1404 (9th Cir. 1994); see also Ms. S. ex rel. G. v. Vashon Island School Dist., 337 F.3d 1115, 1136-37 (9th Cir. 2003),

14

superseded by statute on other grounds by Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105-17, 111 Stat. 37 (1997).

In this case, the IEP team considered evidence of Marcus's lack of educational progress and determined that he, in fact, needed a more restrictive environment than was being offered by Loveland.  Taking into account the indicators of regression, the alleged lack of communication between Loveland and DOE, and Marcus's father's concerns over his safety, the IEP team concluded that placement in a residential facility would benefit Marcus educationally and socially. Moreover, the IEP team believed that placement at a residential facility would provide DOE with a baseline assessment of Marcus's skill levels that would improve their ability to later assess his needs for future IEPs.  After considering residential facilities proposed by Marcus's father and other IEP team members, the IEP team finally offered Marcus placement at Five Oaks.

Hearings Officer Alm concluded that Plaintiffs had failed to prove by a preponderance of the evidence that placement at Five Oaks was not the least restrictive environment.  This Court's review of the record confirms Hearings Officer Alm's findings.  Three DOE employees visited Loveland on multiple

occasions throughout the 2006-2007 school year to observe Marcus.[10]  They observed Marcus over periods lasting approximately four hours, and took detailed notes regarding Marcus's performance, activities, and lesson plan.  These observations were central in the formation of the IEPs.  All three DOE observers reported that Marcus appeared to be making little to no progress in his IEP goals, and even appeared to be regressing in some areas.  The DOE observers also noted that Marcus's teachers did not appear to be taking adequate notes, or making progress reports regarding Marcus's IEP goals.  Perhaps most importantly, at least some members of DOE reported difficulty in obtaining data on Marcus's educational performance from Loveland.

Moreover, it is undisputed that the State of Hawaii has no residential facilities.  Loveland is not a residential school, as DOE employs the term, because it did not have an integrated educational and living program.  Although Loveland does employ a residential program through the recently-developed Marcus House, this program is separate from the educational aspect of Marcus's placement at Loveland.  Loveland does not report, and DOE cannot obtain, data regarding

---

[10]  One of these DOE employees was District Education Specialist Denise Guerin, who is considered an autism specialist, and who has known Marcus for eight years.

Marcus's activities at Marcus House because they are confidential.[11]  Without this data, and without Loveland's participation in the IEP process, the IEP team would not be able to determine Marcus's progress on his functional goals.[12]

Because the IDEA requires DOE to provide both for Marcus's functional as well as academic needs, the IEP team decided that Marcus required a placement that could provide all necessary data for both his educational and functional goals.  A therapeutic living program like Mana House or a residential program like Marcus House were not appropriate as these types of arrangements could not release the mental health data necessary to determine Marcus's functional progress.  By comparison, a residential school such as Five Oaks could provide the DOE and IEP team with all the necessary data for Marcus's goals. Thus, the IEP team decided that a more restrictive environment of a residential school would best meet Marcus's needs .

_____

[11]  Dr. Dukes, director of Loveland and Marcus House, stated that Loveland's CARF accreditation requires "integrated reporting" of all students. Teachers and support staff are required to make reports, observations, assessments, etc., that combine both academic and mental health aspects of a student.  CARF also mandates strict confidentiality procedures, which prevents Loveland from sharing mental health data with third-parties, like DOE, without the parent being present.

[12]   Functional goals are separate from educational goals, and include Marcus's motor-control abilities and reasoning in daily tasks like teeth-brushing, getting dressed, etc.

Hearings Officer Alm concluded that the evidence and testimony showed that Marcus needed a more restrictive environment in the form of a residential school, and that Five Oaks could provide Marcus an appropriate placement.  The Court sees no justification for overriding the considered judgment of both the IEP Team and the Hearings Officer where it is clear they made a careful analysis and arrived at a reasoned conclusion.

II.     Res Judicata and Collateral Estoppel

Plaintiffs assert that Hearings Officer Alm erred when she ignored the findings made in a previous administrative hearing for the 2006-2007 IEP. Plaintiffs contend that Hearings Officer Alm should have been bound to a determination by a separate hearings officer in a prior due process hearing that Loveland was an appropriate placement for Marcus based on principles of res judicata and collateral estoppel.[13]  This argument is without merit.

In the first instance, by definition, an IEP must be determined annually.  20 U.S.C. § 1414(d).  A number of factors are considered in drafting an IEP, among these are the student's present levels of educational performance

_____

[13]Plaintiffs filed two requests for impartial hearing regarding school year 2006-2007 (DOE-SY-0607-025 and DOE-SY-0607-042).  These requests were consolidated into one hearing, assigned the number DOE-SY-0607-042.  Hearings Officer Young was assigned to the new consolidated case.

("PLEP").  The PLEP is then reviewed against the students measurable annual

goals by the IEP team at the end of the school year to ensure that the student is

adequately progressing.  The team creates a new IEP based on what placement and

services is necessary for the student, based on the student's PLEP and annual

goals.  As such, each IEP for each school year is necessarily a separate

determination, even though an IEP team may rely heavily on programs

implemented from prior years.  A determination by a hearings officer with respect

to one IEP may, therefore, have little to no effect on assessment of a subsequent

IEP.

Moreover, the principles of res judicata and collateral estoppel are not

applicable here because the issues decided by Hearings Officers Young and Alm

were not identical.  A decision by a federal court has preclusive effect where

> (1) the issue necessarily decided at the previous
> proceeding is identical to the one which is sought to be
> relitigated; (2) the first proceeding ended with a final
> judgment on the merits; and (3) the party against whom
> collateral estoppel is asserted was a party or in privity
> with a party at the first proceeding.

Hydranautics v. FilmTec Corp., 204 F.3d 880, 885 (9th Cir. 2000).

In the DOE-SY-0607-042 case before Hearings Officer Young, the

issues on appeal revolved around Marcus's placement at Mana House and whether

DOE was obligated to pay for transportation costs for Marcus and his family.  In contrast, the sole issue on appeal in this case is whether Five Oaks constituted the least restrictive environment.  Even assuming principles of res judicata and collateral estoppel could apply in this context, there is no identity of issues between the two proceedings.  The Court, therefore, rejects Plaintiffs' argument with respect to that issue.

III.    Subsequent Placement at Baldwin

A problem arises, however, when the Court is presented with evidence beyond the record indicating that DOE may have, in fact, been supplied with data on Marcus's progress at Loveland.  One of the stated primary reasons for placing Marcus at a residential facility was to gather baseline data that was allegedly being withheld by Loveland.  Hearings Officer Alm, relying on the representations of DOE witnesses, found that the absence of such data hampered the IEP team's ability to properly assess Marcus's educational and functional needs.  (AR at 124-25.)  Without such open communication and review, Hearings Officer Alm concluded that Marcus required a more restrictive environment.

However, at the first hearing in this case and in subsequent briefing ordered by this Court, the Court was informed that DOE officials may have been apprised of information regarding Marcus's functional skills level from Loveland

20

prior to their testimony before Hearings Officer Alm.  According to Lisa Gifford, a

DOE District Education Specialist who was involved in the IEPs at issue here,

Marcus's IEP team reconvened on May 5, 2008 to develop a new IEP for the

upcoming 2008-2009 school year.  (Gifford Decl. ¶ 6.)  By this time, the IEPs

currently before this Court had already been contested by Marcus's mother and

were the subject of briefing before Hearings Officer Alm.  Prior to the opening day

of hearings before Hearings Officer Alm on April 28, 2008, however, it appears

DOE had obtained additional information about Marcus's functional skills level in

the school, community, and home environments from Loveland.  (Gifford Decl. ¶

4.)  In fact, Ms. Gifford explains that DOE began receiving information from

Loveland on Marcus's progress in November 2007, only a few months after

development of the August IEP at issue here.  Some of the information was

obtained directly from Loveland, while other data was obtained through exhibits

submitted on behalf of Marcus in a prior administrative due process hearing that

took place in January 2008.  (Id.)  Moreover, in January and February 2008,

additional assessments were conducted on Marcus by DOE while he remained at

Loveland.

    Armed with this new information, the IEP team reconvened on May 5,

2008.  (Gifford Decl. ¶ 6.)  At that time, the IEP team determined that Marcus did

not need residential placement; rather, the IEP team concluded that Marcus should

be placed at Baldwin, a public high school in his home community.  (Id.)

According to Ms. Gifford, the Baldwin placement was made pursuant to

> multiple sources of information, including parental input,
> input from Loveland Academy staff, review of prior
> IEPs, observations conducted by Department staff,
> assessments and documentations from Loveland
> Academy that were obtained by the Department in
> November 2007, progress reports from Loveland
> Academy obtained in March 2008, and data collected
> from assessments conducted by the Department on
> Marcus in January and February 2008.

(Id.)

Nevertheless, despite this mountain of information provided in the

interim between when Marcus's mother filed her due process complaint with

respect to the instant IEPs and the May 5, 2008 determination that Marcus needed

only public school placement, DOE officials testified before Hearings Officer Alm

that the instant IEPs were the least restrictive environment.  Such testimony could

have been careful word choice, at best, and outright misleading, at worst.

For instance, Catherin Kilborn, Vice Principal at Iao School, testified

before Hearings Officer Alm on two separate occasions, once immediately prior to

the May 5, 2008 IEP and once almost two months later.  In both instances, she is

careful with her word choice, emphasizing the IEP team's thought process at the

time of the development of the original IEPs at issue here.  (See Tr. 4 of 7 at 15:15-16 ("We did think [residential placement] was appropriate <u>at the time</u>, yes.") (emphasis added).)  Indeed, Vice Principal Kilborn appears catch herself at one point, adding "[c]urrently -- <u>well, at the time this IEP was written</u>, Marcus' placement was just a separate day school.  And there was no way for us to first really establish -- have a clear understanding of what his progress was, given the lack of information that was coming to us."  (<u>Id.</u> at 18:18-22 (emphasis added).)

Vice Principal Kilborn avoids making any statements about Marcus's current needs or whether and to what degree Loveland had been forthcoming with its data on Marcus's progress.  Indeed, she was not involved in any subsequent IEP meetings, as Marcus's new home school had transitioned from Iao to Baldwin shortly after the IEPs at issue in this case.  As such, she may not have been privy to the discussions leading up to the impending May 2008 IEP.

However, Ms. Gifford certainly was aware of the disclosures by Loveland and Marcus's current needs assessments by the time she testified before Hearings Officer Alm on July 9, 2008.  In her testimony, Ms. Gifford spent a considerable amount of time describing the problems she observed at Loveland, including dirty conditions, lack of interaction with his teacher, and a low level of educational materials.  (Tr. 7 of 7 at 179.)  In fact, Ms. Gifford described Marcus's

placement at Loveland as "being baby-sat" and "not an educational program."  (Id. at 175:24-176:10.)  In conclusion, Ms. Gifford explained that Marcus was progressing "because he's going to. But the level of progression I think could be more."  (Id. at 184:5-6.)

Nowhere in her testimony does Ms. Gifford inform Hearings Officer Alm that, in fact, Marcus has now progressed to the point that he no longer needs residential care but instead is being placed in a fully public high school.  Her testimony certainly didn't paint a full picture of Marcus's abilities and needs.

Nevertheless, this Court is limited to reviewing the record before it and only the two IEPs on appeal.  The Ninth Circuit has emphasized that IEPs must be judged "at the time the plans were drafted."  Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).  The Adams court went on to quote a Third Circuit case, which stated:

> Actions of the school systems cannot . . . be judged exclusively in hindsight . . .. [A]n individualized education program ("IEP") is a snapshot, not a retrospective. In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.

Id. (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993) ) (citations omitted).  As such, IEPs are examined "prospectively, rather than

retrospectively." <u>B.V. v. Dep't of Educ., State of Hawaii</u>, 451 F. Supp. 2d 1113, 1126 (D. Haw. 2005).

In this case, there is no evidence on the record contradicting Hearings Officer Alm's findings that DOE had difficulties obtaining information from Loveland at the time the IEPs were developed.  While the supplemental briefing casts a shadow over DOE's allegations regarding Loveland's willingness to turn over documentation and/or grant DOE access to observe Marcus, there is no evidence before this Court that the IEP team's concerns were unfounded at the time.  At the time the offer for placement at Five Oaks was made, DOE clearly felt that Marcus needed the more restrictive environment of a residential program.  The Court cannot second-guess this determination based on information that was only supplied to DOE after the IEPs were created.  In fact, the reason why the IDEA provides for annual review of a student's IEP is precisely to adapt it to the student's ever-changing abilities and needs.  <u>See</u> 20 U.S.C. § 1414(d).

Accordingly, this Court AFFIRMS the decision of Hearings Officer Alm.  While Marcus may no longer need residential care at Five Oaks, the Court finds that the IEP team provided him with the least restrictive environment as best they could at the time the determination was made.

IV.   <u>Payment of Housing Costs at Loveland</u>

At the hearing on the matter, counsel for Plaintiffs voiced his concern over the fact that DOE was refusing to pay for Marcus's housing expenses while he remained at Loveland and Marcus House pursuant to the "stay put" provision of the IDEA.  This echoed argument made by Plaintiffs in their opening brief.  (<u>See</u> Opening Brief at 25-29.)

This Court, however, has no jurisdiction over such a question.  The sole issue before Hearings Officer Alm was whether DOE had failed to provide the least restrictive environment for Marcus in the IEPs.  (AR at 48-49, Plaintiffs' Closing Brief listing this as the sole issue for determination.)  Because Hearings Officer Alm concluded that Five Oaks was the least restrictive environment and not Loveland, there was no need to address whether living expenses should be paid for Marcus's residential program at Loveland.  As such, any issue relating to payment of Marcus's housing expenses during the period of the "stay put" provision was not exhausted below and this Court lacks jurisdiction to decide the issue.  <u>See</u> <u>J.L.</u>, 575 F.3d at 1038.

Such a dispute does not belong in the context of an appeal from a due process proceeding, as that has to do with the IEPs themselves.  Instead, the issue

of failure to pay during a "stay put" may more properly be raised in a separate proceeding.

<u>CONCLUSION</u>

For the reasons stated above, the Court AFFIRMS the Decision of Hearings Officer Alm.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 21, 2009.



_____
David Alan Ezra
United States District Judge

<u>Marcus I. v. Department of Education</u>, Civ. No. 08-00491 DAE/BMK; ORDER AFFIRMING DECISION OF HEARINGS OFFICERS